1    Roksana D. Moradi-Brovia (Bar No. 266572)
     Matthew D. Resnik (Bar No. 182562)
2    **RHM LAW LLP**
3    17609 Ventura Blvd., Suite 314
     Encino, CA 91316
4    Telephone: (818) 285-0100
     Facsimile: (818) 855-7013
5    roksana@RHMFirm.com
     matt@RHMFirm.com
6

7    *Proposed Attorneys for Plaintiff/Debtor*
     DRIP MORE, LLC
8

9    Steven J. Mirsky (SBN 297370)
     **MIRSKY CORPORATE ADVISORS, APC**
10   901 Dove. St, Ste. 120
     Newport Beach, CA 92660
11   (949) 200-6837
12   smirsky@mirskycorporateadvisors.com

13
     *Proposed Special Counsel for Plaintiff/Debtor*
14   DRIP MORE, LLC

15

16              **UNITED STATES BANKRUPTCY COURT**

17   **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

18

19   In re:                              Case No. 8:24-bk-11703-SC

20   DRIP MORE, LLC,                     Chapter 11

21

22          Debtor and Debtor in Possession.    **ADVERSARY COMPLAINT FOR:**

23   _____   **(1)  RICO** (18 U.S.C. § 1962)**;**
                                          **(2)  CONSPIRACY** (18 U.S.C. § 1962(d))**;**
24   DRIP MORE, LLC,                      **(3)  DECLARATORY RELIEF** (28 U.S.C.
                                              § 2201)**;**
25          Plaintiff/Debtor,            **(4)  USURY** (CAL. CONST. ART. XV,
                                              SEC. 1 AND CAL CIV. CODE § 1916)**;**
26          v.                           **(5)  UNFAIR AND DECEPTIVE ACTS
27                                            AND PRACTICES** (CAL. BUS. &
     HARPER ADVANCE LLC, a California        PROF. CODE § 17200)**;**
28   limited liability company; MODO LLC, a **(6)  BREACH OF CONTRACT 22;**
     company; FUNDOMATE               **(7)  BREACH OF CONTRACT 30;**

TECHNOLOGIES, INC., a California corporation; FUNDOMATE, LLC, a Delaware limited liability company; DOV HERSHBERG, an individual; JOSH LEVINE, an individual; SAM SHAPIRO, an individual; and DOES 1-20;

        Defendants.

**(8)   BREACH OF CONTRACT 32;**
**(9)   BREACH OF CONTRACT 34;**
**(10) BREACH OF CONTRACT 37;**
**(11) BREACH OF IMPLIED CONVENENT OF GOOD FAITH AND FAIR DEALING;**
**(12) FRAUDULENT INDUCEMENT;**
**(13) FRAUDULENT MISREPRESENTATION;**
**(14) UNJUST ENRICHMENT;**
**(15) AVOIDANCE OF PREFERENCES** (11 U.S.C. § 547)**;**
**(16) AVOIDANCE OF FRAUDULENT TRANSFER** (11 U.S.C. § 548)**;**
**(17) AVOIDANCE OF VOIDABLE TRANSFER** (11 U.S.C. § 544; CAL. CIV. CODE § 3439.05);
**(18) RECOVERY OF AVOIDED TRANSFER(S)** (11 U.S.C. § 550)**; AND**
**(19) PRESERVATION OF AVOIDED TRANSFER(S) FOR THE BENEFIT OF THE ESTATE** (11 U.S.C. § 551)

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

Drip More LLC, a California limited liability company, the debtor and debtor-in-possession in the main Chapter 11 bankruptcy proceeding identified as *In re Drip More, LLC*, Bankruptcy Case No. 8:24-bk-11703-SC (the "Bankruptcy Case"), and the plaintiff in this adversary proceeding, hereby alleges and states as follows:

**INTRODUCTION**

1.    Plaintiff and Debtor Drip More, LLC ("Drip More") is a California business engaged in developing, manufacturing, and distributing tobacco extract to be used in vaping devices. Drip More experienced meteoric growth from its inception. To support its growth, Drip More sought access to capital to maintain its business operations. Unfortunately, due to Drip More's lack of financial sophistication, it fell prey to a business financing scheme known as "Merchant Cash Advance" or "MCA" financing. As a result, the Merchant Cash Advance agreements strangled Drip More's business, resulting in the filing of the Bankruptcy Case on July 5, 2024.

2.      The Defendants in this adversary proceeding, Harper Advance, LLC, and affiliated entities and persons, have been operating in concert with each other to unlawfully transact MCA business transactions in the State of California by making usurious loans to California businesses, in violation of California Constitutional law, without the California lender's license required by California's Financial Code §§ 22000, *et seq*., and in violation of numerous other California and federal laws.

3.      Defendant Harper Advance, LLC ("Harper") made ten (10) usurious loans to Drip More which are at issue in this Complaint (the "MCA Agreements").  In return for the total funds of $4.1M loaned by Harper under the MCA Agreements, Harper is seeking repayment of $12.7M. It is against this backdrop that Drip More files this Complaint.

4.      Defendants, all affiliated with Harper, collectively operate as a classic predatory lender, whose unlawful and fraudulent business practices, coupled with unlawful collection tactics, destroy California businesses while unjustly enriching themselves.

5.      Pursuant to "Purchase and Sale of Future Receivables" agreements (*i.e.*, the MCA Agreements), Harper purportedly paid lump sums to allegedly purchase Drip More's future receipts at a discount and Drip More agreed to repay the face value of its receipts through daily payments.

6.      While nominally identified as the purchase of future receipts, the terms of the MCA Agreements, along with the Defendants' actions, demonstrate that despite the form of their agreements, no sale of actual receipts ever took place, and that the MCA Agreements were actually disguised loans.  The form of the MCA Agreements was merely a sham to evade applicable usury laws.  In reality, the parties entered into a series of transactions that were loans charging interest rates that ranged between than 400% and 1,278%, rates that are far greater than the maximum 10% permitted under California law by a lender without a California Finance Lending License. Charging these rates is a civil and criminal violation under California law.[1]

---

[1] Cal. Civ. Code § 1916-3 ((b) Any person who willfully makes or negotiates, for himself or another, a loan of money, credit, goods, or things in action, and who directly or indirectly charges, contracts for, or receives with respect to any such loan any interest or charge of any nature, the value of which is in excess of that allowed by law, is guilty of loan-sharking, a felony, and is punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year.")

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

7.      Harper, pursuant to the terms of the MCA Agreements, and by its conduct, does not bear the risk that would ordinarily be associated with an actual purchase of future receipts. Instead, the risk is borne by Drip More, as the borrower, with Harper bearing only the minimal risk that the non-payment of receivables will leave Drip More unable to pay Harper.  As a result, Harper never made a bona fide purchase of Drip More's receivables under each of the MCA Agreements and the transactions are, in reality, loans.

8.      The State of California's usury limitations represent a fundamental state interest, so much so that they are incorporated into Article 15 of the California Constitution. Efforts to suborn, evade or dilute this critical legal protection through artifice, fraud and clever drafting have been rejected by California courts and they should be rejected in this case.

9.      This action encompasses various state and federal causes of action relating to these usurious loans and unconscionable agreements, as well as conduct to collect on them, as well as the broader claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO") and for Conspiracy.

10.     The causes of action are brought against Harper Advance LLC, a merchant cash advance ("MCA") company, three affiliated companies -- Modo, LLC, Fundomate, Inc. and Fundomate, LLC -- and three affiliated persons - Dov Hershberg, Josh Levine, and Sam Shapiro – for their roles in the predatory practices at issue in this matter.

## JURISDICTION AND VENUE

11.     Drip More filed a voluntary Chapter 11 petition under Title 11 of the United States Code (beginning at 11 U.S.C. §§ 101, *et. seq,* the "Bankruptcy Code") on July 5, 2024 (the "Petition Date"), initiating the Bankruptcy Case.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

13.     This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), (K), and (O).

14.     Venue properly lies in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409, as Drip More's underlying bankruptcy case is pending before this Court.

///

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

15.     This Court has personal jurisdiction over Defendants because they are creditors of Drip More. Furthermore, each party is a California entity, domiciled in California, and/or maintaining principal places of business and conducting business in the Central District of California.

### THE PARTIES

16.     Drip More is the Debtor and Debtor in Possession in the Bankruptcy Case, and a California limited liability company with a principal place of business in Central District of California.

17.     Defendant Harper scheduled as a creditor in the Bankruptcy Case, and is a California limited liability company with s primary place of business at 7162 Beverly Blvd # 204, Los Angeles, CA 90036.

18.     Defendant Modo LLC ("Modo") is scheduled as a creditor in the Bankruptcy Case, a company with unknown registration, conducting business operations within the State of California with a primary place of business of 7162 Beverly Blvd #204, Los Angeles, CA 90036.

19.     Defendant Fundomate Technologies, Inc. ("Fundomate Inc.") is scheduled as creditor in the Bankruptcy Case, and is a California Corporation with a principal place of business at 300 Continental Boulevard, Suite 410, El Segundo, California 90245.

20.     Defendant Fundomate, LLC ("Fundomate LLC") is scheduled as a creditor in the Bankruptcy Case, and is a Delaware limited liability company with a principal place of business at 300 Continental Boulevard, Suite 410, El Segundo, California 90245.

21.     Defendant Dov Hershberg ("Hershberg") is an individual and, upon information and belief, resident of Los Angeles, California.  Upon information and belief, Hershberg is an owner and/or agent of Harper and Modo.

22.     Defendant Josh Levine ("Levine") is an individual, and upon information and belief, resident of California.  Upon information and belief, Levine is an employee and/or agent of Harper.

23.     Defendant Sam Shapiro ("Shapiro") is an individual and, upon information and belief, resident of California.  Upon information and belief, Shapiro is an owner and CEO of Fundomate Inc and Fundomate LLC.

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

24.     Defendant Does 1-20 are other individuals or entities, presently unidentified, that upon information and belief are also engaged, directly or indirectly, in the conduct giving rise to this Complaint.  Drip More is unaware of the names of these other potential defendants who may be responsible for the unlawful practices, acts, conduct, and occurrences alleged herein. Drip More will seek leave of the Court to amend this Complaint to allege the true names and capacities of these unknown defendants, and to detail the roles they played, once their identities and/or manner of participation in the wrongful conduct herein described is ascertained.

25.     Upon information and belief, at all relevant times and as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of one or more of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Upon information and belief, each of the Defendants' acts alleged herein were done with the permission and consent of each of the other Defendants.

26.     Defendants Harper, Modo, Fundomate Inc. and Fundomate LLC, Hershberg, Levine, Shapiro and Does 1-20 are collectively referred to herein as the "Defendants."

27.     Upon information and belief, one or more of the Defendants may have been alter egos of each other and there may have existed a unity of interest and ownership between those Defendants such that any separateness between them does not exist and that one of the Defendants completely controlled, dominated, managed, and operated the others instrumentalities designed to avoid personal liability for intentional and unlawful actions in violation of the laws of the United States and the State of California.

## BACKGROUND OF THE MCA INDUSTRY

A.      The Predatory MCA Industry

28.     The MCA industry specializes in providing high-risk, high-interest rate loans for businesses. As a whole, the MCA industry seeks to hide within the gray areas of the law, attempting to take advantage of procedural remedies and loopholes in distant state courts to disguise its predatory lending practices.

///

29.     The Federal Deposit Insurance Corporation ("FDIC") has stated that "predatory lending" involves at least one of the following elements: (1) making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation; (2) inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced…; or (3) engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting or unsophisticated borrower."[2]

30.     MCA companies frequently require unaffordable payments that they know the debtor is unlikely to repay. They further leverage various legal and contractual processes to guarantee full repayment under the contract. Generally speaking, MCA companies will seek to obtain a default judgment on a borrower, knowing that the borrower is unlikely to retain counsel because they cannot afford it.  In other cases, MCAs will levy a lawsuit with the intent to enter into an onerous settlement agreement, whereby a debtor remains obligated to make all the remaining payments but waive any rights to prosecute a claim against the MCA lender.

B.      MCA Agreements Are Substantively and Procedurally Unconscionable.

31.     Generally, MCA agreements are unconscionable contracts of adhesion that are not negotiated at arms-length and target small businesses facing a cash crunch and possible closure.

32.     Such agreements often contain many one-sided terms that seek to place all risk of loss on the borrower and maximize the lender's ability to collect full payment under the contract.

33.     Among the one-sided terms that are typical in MCA agreements are: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around; (4) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction with substantive law more favorable to the MCA company, (5)

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

---

[2] FIL-6-2007 Attachment | FDIC

waivers of the borrower's procedural defenses; (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition against obtaining financing from other sources, (11) an assignment of lease of the merchant's premises in favor of the MCA company, (12) the right to direct all credit card processing payments to the MCA company, (13) a power-of-attorney permitting the MCA lender to take any action or execute any instrument or document to settle all obligations due….; and (16) consent to electronic communications on behalf of the merchant and the merchant's associates in order to collect payment.

34.     Generally, MCA agreements are also unconscionable because they contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transactions are not loans, (2) the weekly payment is a good-faith estimate of the receivables, (3) the fixed weekly payment is for the borrower's convenience, (4) there is no repayment term;  (5) the automated ACH program is a labor-intensive (and not automated) process requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee;.

35.     In addition, the MCA Agreements are unconscionable because they are designed to fail and cause the merchant to default. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant business suffers any downturn in revenues (1) because the reconciliation provision will not, in any case, result in an adjustment of the daily remittance; (2) by preventing the merchant from obtaining other financing, (3) and by requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of merchant.

36.     The MCA Agreements also contain numerous improper penalties that violate strong California public policy. Among these improper penalties, the MCA agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed

weekly payment.

## FACTUAL BACKGROUND OF THIS DISPUTE

## THE MCA AGREEMENTS

37.     As alleged above, Drip More develops, manufactures, and distributes tobacco extract to be used in vaping devices.

38.     Drip More does not have preexisting contracts that require it to produce products for a specific price or amount in the future. Drip More's operation relies on customers to continually submit purchase order to generate revenue. When Drip More receives a payment from a customer, it then buys the material, manufactures the product, and ships the product according to the purchase order. The remaining balance is gross profit.  Drip More uses the gross profit to pay for operating expenses, such as employee salaries, marketing, *etc.*

39.     Beginning in or around 2020, Drip More sought financing to sustain its business growth.  Drip More was induced into signing agreements with Harper. Harper, on its website, holds itself out as a "direct lender."

40.     Harper and Drip More entered into at least thirty-seven (37) financing agreements from 2020 through 2024. Presently, Harper and Drip More are parties to ten (10) Standard Merchant Cash Agreements, whereby Harper purportedly purchased the Drip More's "future receivables" (*i.e.*, receivables for goods and services that have not yet been rendered and do not yet exist), in exchange for a sum of money.

41.     The ten (10) MCA Agreements at issue here are as follows:

a.   Contract ERC, dated February 27, 2023, with a Purchase Price of $1,820,000.00, Net Receipts of $2,820,000, Receivable Purchased Amount of $3,657,000.00, and called for daily payments of $12,500.00 ("Contract ERC").

b.   Contract #19, dated August 1, 2023, with a Purchase Price of $560,000.00, Net Receipts of $210,000.00, Receivable Purchased Amount of $839,440.00, and called for daily payments of $10,000.00 ("Contract #19").

c.   Contract #22, dated August 21, 2023, with a Purchase Price of $795,000.00, Net Receipts of $253,745.00, Receivable Purchased Amount of $1,191,705.00, and

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

1    called for daily payments of $10,000.00 ("Contract #22").

d.    Contract #25, dated September 26, 2023, with a Purchase Price of $537,275.00, Net Receipts of $140,000.00, Receivable Purchased Amount of $805,375.23, and called for daily payments of $8,053.76 ("Contract #25").

e.    Contract #27, dated October 23, 2023, with a Purchase Price of $475,000.00, Net Receipts of $100,000.00, Receivable Purchased Amount of $712,025.00, and called for daily payments of $7,120.25 ("Contract #27").

f.    Contract #30, dated November 22, 2023, with a Purchase Price of $750,000.00, Net Receipts of $100,000.00, Receivable Purchased Amount of $1,124,250.00, and called for daily payments of $6,245.84 ("Contract #30").

g.    Contract #32, dated December 11, 2023, with a Purchase Price of $1,491,567.00, Net Receipts of $175,000.00, Receivable Purchased Amount of $2,235,858.93, and called for daily payments of $18,484.29 ("Contract #32").

h.    Contract #34, dated December 28, 2023, with a Purchase Price of $575,000.00, Net Receipts of $145,000.00, Receivable Purchased Amount of $861,925.00, and called for daily payments of $8,619.25 ("Contract #34").

i.    Contract #35, dated January 2, 2024, with a Purchase Price of $350,000.00, Net Receipts of $60,000.00, Receivable Purchased Amount of $524,650.00, and called for daily payments of $5,246.50 ("Contract #35").

j.    Contract #37, dated January 17, 2024, with a Purchase Price of $530,000.00, Net Receipts of $144,000, Receivable Purchased Amount of $794,470.00, and called for daily payments of $7,944.70 ("Contract #37").

42.    Although Harper alleges that each transaction constitutes a sale, the agreements transfer risk of loss to Drip More and Harper seeks to enforce unconditional payment obligations on Drip More's estate.

43.    While the economic provisions of each transaction differ, the Agreements share the same general features: (1) a description of economic terms; (2) a reconciliation provision; (3) an estimated payment term; (4) the granting of a security interest; (5) a personal guaranty; (6) clauses

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

permitting so-called "Protections Against Default"; and (7) general provisions related to choice of law, costs, pre- and post-judgement interest, and legal fees. By and large, these provisions serve to transfer risk of loss away from Harper and entirely onto Drip More.

A.   <u>Description of Economic Terms</u>

44.   The first page of each MCA Agreement contains a table that lists several variables for economic terms: (1) the "Purchase Price"; (2) the "Receivable Purchased Amount"; (3) the "Specified Percentage"; (4) the "Net Funds Provided"; (5) the "Net Amount to Be Received Directly by Merchant(s)"; and (6) the "Initial Estimated Payment". The "Purchase Price" is defined as "the amount being paid to [Debtor] for the Receivables Purchased Amount." The "Receivable Purchased Amount" is defined as the total amount of future receivables subject to purchase. A "Receivable" is defined as "all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of [Debtor's] business."

45.   Generally speaking, in a sale, the Seller determines the price of the sale. Here, each Agreement allows Harper to determine the Purchase Price and permits Harper to unilaterally reduce the sum of money provided to Drip More.

46.   For instance, the "Net Funds Provided" allows Harper to reduce the "Purchase Price" by deducting "additional fees" listed in Section 2 of the MCA Agreement. Such "additional fees" include fees related to expenses for "underwriting", wire transfer fees, default fees, UCC fees, and "court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of [Harper's] legal or contractual rights against [Debtor] and/or Guarantor…".

47.   The MCA Agreements permit Harper to further reduce the sum of money delivered to Drip More by defining a term called "Net Amount to Be Received Directly by Merchants." Not to be confused with "Net Funds Provided," the "Net Amount to Be Received Directly By Merchants" states that "[t]his is the amount merchant will receive "after deduction of applicable fees listed in Section 2 below and the payment of any part of the Purchase Price elsewhere in the document."

///

48.     Thus, in exchange for receiving a sum of money equal to the "Net Amount to Be Received Directly by Merchants," each Agreement "irrevocably authorizes" Harper to withdraw from Drip More's account an amount of money equal to the "Specified Percentage" until Harper receives "payment in full of the of the Receivable Purchased Amount."

B.      Reconciliation Provision

49.     Section 4 of each MCA Agreement sets forth terms related to reconciliation. In theory, a reconciliation provision is a requirement that is designed to reconcile the daily amounts collected by a merchant cash advance lender based on the actual revenues generated by the merchant. If, for example, the merchant's revenues are less than anticipated, the merchant cash advance lender may lower the merchant's daily remittance through the application of the reconciliation clause.

50.     Here, the reconciliation provision under the MCA Agreements is a sham. It merely unilaterally permits Harper to conduct an inquiry into whether it "collected more than it was entitled to" or "less than it was entitled to" so that Harper can "ensure" that the amount it has collected "equals the Specified Percentage of [Debtor]'s Receivables."

51.     The reconciliation provision does not permit any modification in the amount to be collected or in the Specified Percentages based on the actual revenues generated by Drip More.

C.      Estimated Repayment Term

52.     Each MCA Agreement provides an estimated repayment term, since the Specified Percentage of [Debtor's] Receivables is fixed and not subject to adjustment. It is possible to determine the estimated term by dividing the "Receivables Purchased Amount" by the "Estimated Daily Payment."

53.     Under the MCA Agreements, Harper expected, on average, that it would receive the full amount of the "Receivable Purchased Amount" under each agreement in a period of less than four (4) months.

D.      Granting of Security Interest

54.     Section 33 of each MCA Agreement also required Drip More to grant Harper a security interest in "Collateral" which is defined as follows: "(a) all accounts, including without

limitation, all deposit accounts, accounts receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC."

E.    Personal Guarantee

55.    In addition to granting a security interest in the Collateral to ensure repayment and fully transfer the risk onto the debtor and/or principal, each MCA Agreement also required Brian Bereber ("Bereber") to personally guarantee the performance of "all representations, warranties, and covenants made by [Debtor] to HA in the Agreement…." Each MCA Agreement further permitted Harper to enforce the MCA Agreements "without first seeking to obtain payment from any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral HA may hold pursuant to this Guaranty or any other agreement or guarantee."

F.    Protections Against Default

56.    Section 17 of each MCA Agreement contains certain "Protections Against Default." In essence, the so-called "Protections Against Default" are remedies that Harper may exercise "immediately and without notice" upon the occurrence of an Event of Default (to be discussed below) or other upon other events that hinders, restricts, or limits Harper's ability to collect payments under the Agreement.

57.    Such "protections" permit Harper (1) to immediately accelerate payment "the full uncollected Receivables Purchased Amount plus all other fees due under this Agreement…"; (2) to "enforce the provisions of the Guarantee against Guarantor"; (3) to "enforce its security interest in the Collateral"; (4) to "protect and enforce its rights and remedies by litigation or arbitration"; (5) to "debit any of [Debtor]'s depository accounts wherever situated…in an amount consistent with the terms of this Agreement"; and (6) to exercise its rights as an "irrevocable power-of-attorney" to direct "credit card and/or check processors to make payment to [Harper]".

58.    Each MCA Agreement contains broad definitions of Events of Default that are designed to transfer as much risk as possible to the borrower. For instance, a violation of "any term" in "this Agreement" or "any default…of any other agreement with [Harper]" are Events of

Default that will permit Harper to accelerate repayment for the full "Receivables Purchased Amount."

G.    Events of Default

59.    Each MCA Agreement gives Harper ample opportunity to declare an event of default. The Events of Default are designed to maintain as much control over the borrower's business as possible and also maximize the likelihood that a default will occur under normal circumstances. The Events of Default are further designed to eliminate a borrower's ability to defend itself from Harper's predatory lending practices and maximize Harper's ability to collect the full value of the Receivables Purchased Amount.

60.    For instance, under Section 34 of the MCA Agreements, an "Event of Default" includes, but is not limited to, the following:

    a.    "Any Merchant violates any term or covenant of this Agreement";

    b.    "Any representation or warranty by any Merchant in the Agreement with HA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;"

    c.    "Any Merchant fails to provide Harper with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter…;"

    d.    "The sending of any notice of termination by any Merchant or Guarantor;"

    e.    "Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business intentionally and not in the ordinary course of business without the prior written consent of HA other than a bankruptcy filing;"

    f.    "Any Merchant performs nay act that reduces the value of any Collateral granted under this Agreement;"

    g.    "Any Merchant prevents HA from collecting any part of the Receivables Purchased Amount;"

    h.    "Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with HA."

61.    In other words, an Event of Default will occur unless Harper receives the full daily

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

payment amount on time under each agreement until it receives the total Receivable Purchased Amount under each MCA Agreement.

H.    General Provisions

62.    Each MCA Agreement sets forth other provisions that are designed to transfer risk away from Harper and grant Harper with procedural and substantive protections to increase the likelihood of enforcing absolute repayment obligations under each Agreement.

63.    For instance, Section 14 of each Agreement contains a waiver of liability, stating: "In no event shall [Harper] be liable for any claims asserted by [Debtor] under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by [Debtor] and Guarantor."

64.    Section 39 of each MCA Agreement sets forth choice of law provisions. Each MCA Agreement states that the Agreement "and the relationship between [Harper], [Debtor], and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws."

65.    Even though each MCA Agreement purports to be governed by New York law, Section 35 of each MCA Agreement requires that Drip More "waive the right to a notice and hearing under *Connecticut General Statutes* section 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order." Upon information and belief, this reference to Connecticut law would permit Harper to attach its claims of the Receivable Purchased Amount to Drip More's assets as a prejudgment remedy without a hearing or court order.

66.    Section 42 of the MCA Agreements contain a counterclaim waiver where Drip More and Guarantor are "not permitted to interpose any counterclaim" in the event of litigation.

67.    Sections 44 and 46 of the Agreements set forth terms related to costs and legal fees. Section 44 states that the Drip More must pay "all of [Harper's] reasonable costs associated with a breach by any [Debtor] of the covenant in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit." Section 46 further provides

that if Harper "prevails in any litigation or arbitration…then [Debtor] and/or Guarantor must pay HA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed."

68.     Section 45 of the MCA Agreements set forth terms related to pre- and post-judgment interest. Section 45 states that if Harper is entitled to an entry of judgment, then Harper will be entitled to the recovery of "prejudgment interest at a rate of 24% per annum… or the maximum rate permitted by applicable law if less." Post-judgment interest also accrues at "24% per annum…or the maximum rate permitted by applicable law if less…up until actual satisfaction of the judgment."

### THE PLEDGE AGREEMENT

69.     In addition to the MCA Agreements, on March 23, 2023, Harper required Drip More to sign a pledge agreement (the "Pledge Agreement") in exchange for an assignment of Fundomate Inc's assignment of Drip More's previously assigned Employee Retention Credits to Harper.

70.     Under the Pledge Agreement, Drip More agreed to pledge all of its "right, title, and interest, powers, options, privileges, and all other benefits" in all dividends, distributions, cash, all equity interests "and other property", and all "products and proceeds."

71.     The Pledge Agreement further stated that if Drip More defaults under any of the MCA Agreements, then the Pledge Agreement "shall become an absolute and unconditional [p]ledge, transfer, and conveyance of [Drip More's] rights" to all of its assets.

72.     Harper sought additional security under the Pledge Agreement in the form of a Guaranty of Payment and Performance, dated March 23, 2023 (the "March Guaranty"). Under the March Guaranty, the recitals state that Harper requires an "unconditional guaranty of payment and performance to [Harper] of [Drip More's] obligations under the [MCA Agreements]."

73.     The Pledge Agreement further requires the guarantor to make a payment under the MCA Agreements regardless of the "insolvency, bankruptcy adjustment, liquidation, disability, dissolution, or lack of power of Merchant, any Guarantor, or any other party at any time liable for payment of all or part of the Obligations."

74.     The Pledge Agreement also states that the Guarantor will remain liable to pay all obligations even if the underlying obligations despite the "invalidity, irregularity, illegality, or

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

unenforceability of all or any part of the Obligations, or any document or agreement executed in connection with the Obligations, for any reason whatsoever."

## DRIP MORE'S INSOLVENCY

75.     In the late summer, early fall of 2023, Bereber expressed to Hershberg that Drip More was not performing. Bereber was consistently seeking financing in order to make ends meet. From the period of August 2023 through January 2024, Drip More entered into nineteen (19) separate MCA agreements with Harper.

76.     Harper, knowing that Drip More could not afford to make payments, intentionally entered into the contracts under increasingly oppressive terms.

77.     Harper repeatedly "refinanced" the MCA agreements by allegedly "rolling" prior debts into a new merchant cash agreement. But this does not make sense. If each MCA agreement were, in fact, a sale of future receivables, then Drip More would first need to buy back its portion of the future receivables in order to "re-sell" them under a new MCA agreement.

78.     In addition, if an MCA Agreement purports to sell future receivables, then the practice of "rolling" begs the question: how does one determine the future value of future receivables? Is it infinite? At what point does the value of future receivables exceed a merchant's ability to produce?

79.     During this period, it appears that Harper still placed great value on Drip More's ability to produce future receivables despite not having working capital and not being able to pay employees or vendors. The total value of the Receivables Purchased Amount for all nineteen (19) agreements during this period was $11,084,868.16.

## HARPER'S PRE-LITIGATION ACTIVITIES

80.     Upon information and belief, Hershberg and Harper sought to provide "assistance" to Drip More by installing Levine to review Drip More's books and records.

81.     Upon information and belief, Hershberg and Levine directed Drip More employees to make purchases and terminate certain contracts.

82.     Upon information and belief, Hershberg and Levine coerced Drip More employees to "work on behalf" of Drip More by offering them jobs after Harper "took over the company."

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

83. Upon information and belief, on January 31, 2024, Hershberg called Drip More employees stating that Hershberg is in complete control of Drip More; (2) demanded that Drip More employees prevent Bereber from entering office building; (3) demanded that Drip More Employees begin selling off assets; and (4) offered oral employment contracts to Drip More employees for complying with Hershberg's demands.

84. On February 26, 2024, Harper issued a Notification of Disposition of Collateral stating that it intended to sell all of Drip More's assets at a public auction in New York.

85. On February 29, 2024, Harper issued a Notification of Disposition of Collateral indicating that it sought to sell Drip More's equity interest under the pledge agreements at a public auction in Los Angeles.

86. From March through April, Harper and Drip More engaged in lengthy settlement discussions to seek to find a compromise to the dispute.

87. Ultimately, on April 10, 2024, the parties filed dueling lawsuits in the State of New York.

## FIRST CAUSE OF ACTION

### RICO, 18 U.S.C. § 1962

(Against All Defendants)

88. Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth here.

A. The Unlawful Activity.

89. There are at least three (3) predicate acts underlying the First and Second Causes of Action: making of unlawful debts (usury), engagement in wire fraud, and collection of unlawful debts.

90. As set forth more fully above, despite the many false statements and contract terms to the contrary, the financial arrangements between Harper and Drip More were loans, and not merchant cash advances.

91. California places limits on the amount of interest that can be charged in connection with providing a business loan.

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

92.    Here, the interest rate that Drip More actually paid on the MCA Agreements at issue in this case are as follows:

| ERC | 130% |
|---|---|
| Contract 19 | 400% |
| Contract 22 | 470% |
| Contract 25 | 575% |
| Contract 27 | 712% |
| Contract 30 | 1124% |
| Contract 32 | 1278% |
| Contract 34 | 594% |
| Contract 35 | 874% |
| Contract 37 | 567% |

93.    The disclosures Defendants made about these loans are clearly fraudulent (for example, the MCA Agreements' representation that "Sale of Receipts (THIS IS NOT A LOAN)," and violate California usury law, as set forth more fully herein.

94.    In the process of making and collecting on these loans, Enterprise Defendants utilized wire transfers and electronic communications to further their illegal activities.

B.    Culpable Persons.

95.    Each and every one of the Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

96.    At all relevant times, each of the Defendants was, and is, a person that exists separate and distinct from the Enterprise, described below.

97.    Upon information and belief, Hershberg has an ownership interest in Harper and is the mastermind of the Enterprise.

98.    Upon information and belief, Hershberg also has an ownership interest in Modo.

99.    Upon information and belief, Shapiro has an ownership interest in the Fundomate

entities.

100.     Levine is an agent and/or employee of Harper, installed by Harper as *de facto* CFO of Drip More, with full and complete access and authority to review and access all of Drip More's financial records and accounts and distribute them according to Harper's priorities and without concern for Drip More's customers or other creditors.

101.     Through their operation of Harper, the Defendants solicit, underwrite, fund, service and collect upon unlawful debt incurred by small businesses like Drip More, and including Drip More.

C.     The Enterprise.

102.     The Defendants together constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

103.     The Defendants are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than one hundred times the enforceable rate under the laws of California.

104.     Since at least 2020 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including Drip More.

105.     Defendant Harper entered into ten (10) MCA Agreements as set forth above in paragraph 3.

106.     The debt evidenced by Drip More's MCA Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes, and (ii) the rates significantly exceed the legal rate permitted under California law.

107.     Since at least 2020 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared

personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

108.   The Enterprise's misconduct also constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

D.   <u>The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.</u>

109.   The Defendants have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows.

<u>Dov Hershberg</u>

110.   Upon information and belief, Hershberg is an owner and the mastermind of the Enterprise. He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

111.   In his capacity as the mastermind of the Enterprise, Hershberg is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; and (ii) the method of collecting the daily payments via ACH withdrawals. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Drip More.

112.   Hershberg has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

113.   Hershberg has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Harper, Modo, Fundomate, and John Does.

### Harper Advance LLC

114.   Harper is organized under the laws of California and upon information and belief maintains officers, books, records, and bank accounts independent of Hershberg and the other Defendants.

115.   Hershberg, Harper, and Levine have operated Harper as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Harper has, upon information and belief: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans to fund the usurious loans; (ii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; and (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt.

116.   In this case, Harper, through Hershberg, and Levine: (i) solicited borrowers; (ii) underwrote the Agreements; (iii) entered into the Agreements; and (iv) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Drip More.

### MODO LLC

117.   Upon information and belief, Modo, LLC is an alter-ego of Hershberg and Harper. Modo made several payments under the MCA Agreements on behalf of Harper.

### Fundomate Inc.

118.   Upon information and belief, Fundomate Inc. entered into agreements with Harper with the intent to create unlawful debts and benefit from the ill-gotten proceeds derived therefrom.

### Sam Shapiro

119.   Upon information and belief, Sam Shapiro owns both Fundomate entities, upon information and belief, conspired with Harper to conduct the Enterprise. Specifically, Shapiro and

Hershberg collaborated in creating the March Guaranty and the Pledge Agreement to gain control over Drip More's assets and membership interests.

Josh Levine

120.    Upon information and belief, Josh Levine, the agent and/or employee of Harper, was installed by Harper to review Drip More's books as the on-site acting CFO.

E.    Interstate Commerce

121.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

122.    All of the transactions were done through wire transfers, or communicated through text, phone and electronic messaging. Drip More serves customers internationally.

123.    The Enterprise received funds from other illegal activities and used those to fund the Drip More

124.    Specifically, members of the Enterprise maintain offices in California and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in California, including Drip More, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

125.    In the present case, all communications between the members of the Enterprise and Drip More were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the weekly payments via interstate electronic ACH debits.

F.    Injury and Causation.

126.    Drip More has been, and will continue to be, injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(c).

127.    The injuries to Drip More directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments.

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

128.    Drip More has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

129.    Pursuant to 18 U.S.C. § 1964(c), Drip More's bankruptcy estate is entitled to treble damages, plus costs and attorneys' fees from Defendants.

### SECOND CAUSE OF ACTION

### Conspiracy, 18 U.S.C. § 1962(d)

(Against All Defendants)

130.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth here.

131.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

132.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the MCA Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

133.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

134.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a

pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

135.    The participation and agreement of each of the Defendants was necessary to allow the commission of this scheme.

136.    Drip More has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

137.    The injuries to Drip More directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected loan payments.

138.    Drip More has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

139.    Pursuant to 18 U.S.C. § 1964(c), Drip More's bankruptcy estate is entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION

### Declaratory Relief, 28 U.S.C. § 2201

(Against Harper)

140.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth here.

141.    An actual controversy exists between Drip More, on one hand, and Harper, on the other hand, as to the true nature of the MCA Agreements.

142.    Drip More asserts that the MCA Agreements are disguised loans.

143.    Harper disputes this characterization and asserts that the MCA Agreements are purchases of receivables.

144.    Drip More therefore seeks a declaration from the Court regarding the nature of the MCA Agreements pursuant to 28 U.S.C. § 2201.

145.    A declaration by the Court is necessary and appropriate to resolve the present dispute and controversy between the parties with respect to the nature of the MCA Agreements.

///

///

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

## FOURTH CAUSE OF ACTION

### Usury, Cal. Const. Art. XV, Sec. 1 and Cal. Civ. Code § 1916-3

(Against Harper)

145.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth here.

146.    All ten (10) contracts between Drip More and Harper are loans as defined in Cal. Civ. Code § 1912.

147.    All repayments made, or called for, under each MCA Agreement between Drip More and Harper in excess of the payments made by Harper constitute interest as defined in Cal. Civ. Code § 1914 and § 1915.

148.    Defendants charged interest rates on the Loans in excess of the 10% usury limitations in Article 15 of the California Constitution and under Cal. Civ. Code § 1916-1.

149.    Defendants, by the terms of their agreement and through their actions, demonstrated that the loan and interest were absolutely repayable by Drip More.

150.    Defendants were not exempt lenders when they made the MCA Agreements and they did not satisfy any of the exemptions to the usury limitations when they made the MCA Agreements.

151.    Defendants, through the terms of the MCA Agreements and by their actions, knowingly, willfully and intentionally charged interest on the sums advanced pursuant to the Loans in excess of California's usury limitation.

## FIFTH CAUSE OF ACTION

### Unfair and Deceptive Acts and Practices, Cal. Bus. & Prof.  Code § 17200

(Against Harper, and Does 1-20)

152.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

153.    Harper engaged in unfair business practices as defined in *Cal. Bus. & Prof. Code §* 17200, specifically, they engaged in (1) "acts or practices which are unlawful and/or or unfair, or (2) fraudulent; and (3) the MCA Agreements were unconscionable.

154.    Specifically, Defendants engaged in one or more of the following unlawful, unfair, and/or fraudulent practices:

    a.   Violation of California Constitution, Article XV, Section 1, prohibitions of usury;

    b.   Lending without a CFL license in violation of Fin. Code § 22000, *et seq.*

155.    In addition, the MCA Agreements were unconscionable. The terms of the MCA Agreements constitute contracts of adhesion, where the contract terms were outside the reasonable expectations of the weaker party and were unduly oppressive. In addition, the MCA Agreements were procedurally unconscionable, as Drip More had no bargaining power to negotiate the agreement or any meaningful choice. Further, the MCA Agreements were substantively unconscionable because the terms reallocate risks to Drip More to such a degree that it shocks the conscience and violates public policy.

**SIXTH CAUSE OF ACTION**

**Breach of Contract 22**

(Against Harper)

156.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth here.

157.    Drip More and Harper entered into Contract 22.

158.    Harper was required to deposit $253,745.00 in Drip More's account.

159.    Upon information and belief, Harper failed to deliver the $253,745.00.

160.    Drip More was harmed as a result in amounts and manner subject to proof at trial.

161.    Harper's breach of contract was a substantial factor in causing Drip More's harm.

**SEVENTH CAUSE OF ACTION**

**Breach of Contract 30**

(Against Harper)

162.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

163.    Drip More and Harper entered into Contract 30.

164.    Harper was required to deposit $100,000.00 in Drip More's account.

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

165.    Upon information and belief, Harper failed to deliver the $100,000.00.

166.    Drip More was harmed as a result in amounts and manner subject to proof at trial.

167.    Harper's breach of contract was a substantial factor in causing Drip More's harm.

**EIGHTH CAUSE OF ACTION**

**Breach of Contract 32**

(Against Harper)

168.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

169.    Drip More and Harper entered into Contract 32.

170.    Harper was required to deposit $175,000.00 in Drip More's account.

171.    Upon information and belief, Harper failed to deliver the $175,000.00.

172.    Drip More was harmed as a result in amounts and manner subject to proof at trial.

173.    Harper's breach of contract was a substantial factor in causing Drip More's harm.

**NINTH CAUSE OF ACTION**

**Breach of Contract 34**

(Against Harper)

174.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

175.    Drip More and Harper entered into Contract 34.

176.    Harper was required to deposit $145,000.00 into Drip More's account.

177.    Upon information and belief, Harper failed to deliver the $145,000.00.

178.    Drip More was harmed as a result in amounts and manner subject to proof at trial.

179.    Harper's breach of contract was a substantial factor in causing Drip More's harm.

**TENTH CAUSE OF ACTION**

**Breach of Contract 37**

(Against Harper)

180.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

181.    Drip More and Harper entered into Contract 37.

182.    Harper was required to deposit $140,000.00 into Drip More's account.

183.    Upon information and belief, Harper failed to deliver the $140,000.00.

184.    Drip More was harmed as a result in amounts and manner subject to proof at trial.

185.    Harper's breach of contract was a substantial factor in causing Drip More's harm.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith & Fair Dealing

(Against Harper)

186.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

187.    Drip More and Harper entered into the ten (10) MCA Agreements at issue in this case, each and every one of which contained an implied promise of good faith and fair dealing, meaning that each party would not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

188.    Drip More did all, or substantially all, of the significant things that the contract required it to do or was excused from having to do.

189.    All conditions required for Harper's performance had occurred.

190.    Harper prevented Drip More from receiving the benefits under the contract, namely assistance with financing business operations. Harper did this by creating and implementing repayment obligations and practices that made it impossible for Drip More to actually conduct business, and would ultimately destroy Drip More's entire business because it was impossible for it to afford the repayments.

191.    By doing so, Harper did not act fairly and in good faith.

192.    Drip More was harmed by Harper's conduct.

## TWELFTH CAUSE OF ACTION

### Fraudulent Inducement

(Against Harper, Hershberg)

193.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

forth in full herein.

194.    Defendants Harper and Hershberg explicitly and fraudulently represented that the financial transactions that are at issue in this case were not loans and grossly misrepresented the interest rates charged, as well as making other false and fraudulent representations.

195.    Harper's and Hershberg's representation of the nature of the MCA Agreements and interest rates were false.

196.    Harper knew that said representations regarding the nature of the MCA Agreements and the interest rates being charged were false when they made them or Harper made the representations recklessly and without regard for their truth.

197.    Harper intended that Drip More rely on these representations by entering into the MCA Agreements.

198.    Drip More reasonably relied on Harper's representations and was induced to enter into the Loan Documents by these fraudulent and deceitful representations.

199.    Drip More was harmed as a result in amounts and manner subject to proof at trial, including, though not limited to, all interest paid on the loans under the MCA Agreements above the rates per annum represented by Harper.

200.    Drip More's reliance on Harper's representations was a substantial factor in causing its harm.

### THIRTEENTH CAUSE OF ACTION

### Fraudulent Misrepresentation

(Against All Defendants)

201.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

202.    In and between 2020 and 2024, Harper presented to Drip More no fewer than ten (10) MCA Agreements which contained, within their language, intentional misrepresentations, including, though not limited to, the following:

a.   Statements that the arrangements being made were "not loans;" and

b.   Representations that the payments did not constitute interest, when in fact the rate

was in excess of 400%.

203.    Harper represented to Drip More that these facts were true, namely that the MCA Agreements were "not loans" when, in fact, they were loans as a matter of legal definition and governance, and that the representations of interest rates were dramatically understated.

204.    Harper's representations of the nature of the MCA Agreements and interest rates were false.

205.    Harper knew that said representations regarding the nature of the MCA Agreements and the interest rates being charged were false when Harper made them or made the representations recklessly and without regard for their truth.

206.    Harper intended that Drip More rely on these representations.

207.    Drip More reasonably relied on Harper's representations and was induced to enter into the MCA Agreements by these fraudulent and deceitful representations.

208.    Drip More was harmed as a result in amounts and manner subject to proof at trial, including, though not limited to, all interest paid on the loans under the MCA Agreements above the rates per annum represented by Harper.

209.    Drip More's reliance on Harper's representation was a substantial factor in causing its harm.

### FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

(Against Harper)

210.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full here.

211.    Harper was unjustly enriched when it received repayments in excess of amounts that would be impermissible under California law, a benefit that it otherwise would not have achieved through a legally compliance loan process.

212.    Harper has been unjustly enriched in amounts subject to proof at trial.

213.    Equity and good conscience therefore require that Harper returns these ill-gotten gains, in an amount according to proof.

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

**FIFTEENTH CAUSE OF ACTION**

**Avoidance of Preferences, 11 U.S.C. § 547**

(Against Harper, Hershberg, and Levine)

214.   Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

215.   During the one (1) year prior to the Petition Date (the "Preference Period"), upon information and belief, Harper, Hershberg, and Levine established themselves as insiders of Drip More, as that term is defined 11 U.S.C. § 101(31), by taking control of Drip More.  Specifically:

a.    Hershberg, on behalf of Harper, installed Levine as acting CFO, making all decisions on what could be paid or not paid, and giving preference to Harper; and

b.    Hershberg called Drip More employees and asserted that Hershberg was in complete control of Drip More; demanded that Drip More employees prevent Bereber from entering the office building; demanded that Drip More employees begin selling off assets; and offered oral employment contracts to Drip More employees for complying with Hershberg's demands.

212.   During the Preference Period, Drip More made transfers to, or for the benefit of, Harper, Hershberg, and/or Levine.

213.   During the Preference Period, Harper, Hershberg, and/or Levine were creditors of Drip More within the meaning of 11 U.S.C. § 547(b)(1) at the time of each of the transfers made during the Preference Period.

214.   Each of the transfers made to Harper, Hershberg, and/or Levine were transfers of an interest of Drip More in property.

215.   The transfers made to Harper, Hershberg, and/or Levine were made to, or for the benefit of, Harper, Hershberg, and/or Levine because each transfer either reduced or fully satisfied a debt or debts them owed by Drip More to Harper, Hershberg, and/or Levine.

216.   The transfers were made for or on account of antecedent debts owed by Drip More;

217.   The transfers were made while Drip More was insolvent.  Drip More is entitled to the presumption of insolvency for each transfer made during ninety (90) days prior to the Petition Date.

RHM Law LLP
17609 Ventura Blvd Suite 314
Encino, CA 91316

218.    The transfers enabled Harper, Hershberg, and/or Levine to receive more than they would have received if (a) Drip More's case was a case under Chapter 7 of the Bankruptcy Code; (b) the transfers had not been made; and (c) Harper, Hershberg, and/or Levine had received payment of such debt(s) to the extent provided by the provisions of the Bankruptcy Code.

219.    By reason of the foregoing, each transfer during the Preference Period should be avoided and set aside as a preferential transfer pursuant to 11 U.S.C. § 547(b).

### SIXTEENTH CAUSE OF ACTION

### Avoidance of Fraudulent Transfers, 11 U.S.C. § 548

(Against Harper)

220.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

221.    Transfers of funds were made from Drip More to or for the benefit of Harper within two (2) years before the Petition Date.

222.    Subject to proof, Drip More pleads, in the alternative, that to the extent one or more of such transfers were not on account of an antecedent debt or were prepayments for goods and/or services subsequently received, Drip More did not receive reasonably equivalent value in exchange for the transfers and (i) insolvent on the dates of the transfers or became insolvent as a result of the transfers; and/or (ii) engaged in business or a transaction for which any property remaining with Drip More was an unreasonably small capital at the time of, or as a result of, the transfers; and/or (iii) Drip More intended to incur, or believed that Drip More would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

223.    By reason of the foregoing, the transfers should be avoided and set aside as fraudulent transfers.

### SEVENTEENTH CAUSE OF ACTION

### Avoidance of Voidable Transfer, 11 U.S.C. § 544; Cal. Civ. Code §§ 3439.05 and 3439.07

(Against Harper)

224.    Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein here.

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316

225. Drip More did not receive consideration reasonably equivalent to the transfers received by, or for the benefit of, Harper during the period(s) covered by California Civil Code Section 3439.05.

226. Drip More was insolvent when the transfers were made.

227. Drip More is entitled to judgment avoiding the transfers pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.05 and 3439.07

**EIGHTEENTH CAUSE OF ACTION**

**Recovery Of Avoided Transfers, 11 U.S.C. § 550**

(Against Defendants Harper, Hershberg, and Levine)

228. Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

229. Drip More is entitled to avoid certain transfers pursuant to 11 U.S.C. §§ 544, 547, and/or 548 (the "Avoidable Transfers").

230. Harper, Hershberg, and/or Levine were the initial transferees of the Avoidable Transfers, the immediate or mediate transferee of such initial transferee(s), or the person for whose benefit all Avoidable Transfers were made.

231. Pursuant to 11 U.S.C. § 550(a), Drip More is entitled to recover from Harper, Hershberg, and/or Levine an amount to be determined at trial based on the avoidance of the Avoidable Transfers.

**NINETEENTH CAUSE OF ACTION**

**Preservation of Avoided Transfers, 11 U.S.C. § 551**

232. Drip More repeats and realleges all of the paragraphs in this Complaint as though set forth in full herein.

233. The Avoidable Transfers are property of Drip More's bankruptcy estate.

234. Accordingly, the Avoidable Transfers, or the value therefore, should be preserved for the benefit of Drip More's estate pursuant to 11 U.S.C. § 551.

///

///

## PRAYER FOR RELIEF

**WHEREFORE**, Drip More seeks judgment against the Defendants as follows:

A.      Compensatory, direct, and consequential damages, including any legally allowed interest, according to proof at trial;

B.      Treble damages under 18 U.S.C. § 1962;

C.      Punitive damages as allowed by law;

D.      Avoidance of transfers made from Drip More assets and accounts to Harper or any other Defendant within pursuant to the ten (10) contract/loans at issue in this case;

E.      Restitution;

F.      Attorney fees and costs, if any are allowable under contract or law; and

G.      Such other and further relief as this case may require and the Court deems just and proper.

Dated: August 27, 2024                **RHM LAW LLP**

By:      /s/ Roksana D. Moradi-Brovia
_____

Roksana D. Moradi-Brovia
Matthew D. Resnik
Counsel for DRIP MORE, LLC

RHM LAW LLP
17609 VENTURA BLVD SUITE 314
ENCINO, CA 91316